**FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

```
FILED
JAMES J. WALDRON, CLERK

December 17, 2008

U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY: /s/Diana Reaves, Deputy
```

|  |  |
|---|---|
| IN RE:<br><br>Cynthia Tamis and Philip Tamis,<br><br>               Debtor. | CHAPTER 7<br><br>Case No.:   04-12252  (NLW) |
| JP Morgan Chase Bank,<br><br>               Plaintiff(s),<br>v.<br><br>Cynthia Tamis and Philip Tamis<br><br>               Defendant(s). | Adv. No.:   04-1687<br><br>**OPINION** |

**Before:**    **HON. NOVALYN L. WINFIELD**

**A P P E A R A N C E S :**

Santo Bonano, Esq.
1430 Route 23 North
Wayne, NJ 07470
Attorneys for Debtor

Paul J. Maselli, Esq.
Maselli Waren, PC
600 Alexander Road
Princeton, NJ 08540
Attorneys for JP Morgan Chase Bank

This adversary proceeding was tried before the court solely with regard to the cause of action asserted under § 523(a)(4) of the Bankruptcy Code. After considering the documents placed into evidence, the testimony of the witness and the applicable law, the court finds that JP Morgan Chase Bank ("Chase") has not met its burden of proving that the debt owed to it is nondischargeable under § 523(a)(4).

The following constitutes the Court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052. The matter is a core proceeding under 28 U.S.C. § 157(b)(2)(I), and the Court has jurisdiction under 28 U.S.C. § 1334 and the Standing Order of Reference issued by the United States District Court for the District of New Jersey on July 23, 1984.

## **STATEMENT OF FACT**

Cynthia Tamis ("C. Tamis") and Philip Tamis ("P. Tamis") (collectively "debtors") filed their Chapter 7 case on January 23, 2004. In April 2004 Chase filed an adversary proceeding against both debtors alleging that the debt owed to it is nondischargeable under § 523(a)(2) and § 523(a)(4) of the Bankruptcy Code. Additionally, Chase asserted a third cause of action under § 727(a)(4) of the Bankruptcy Code, which it later withdrew.

After discovery closed, Chase brought a motion for summary judgment on the § 523(a)(2) and § 523(a)(4) counts. The debtors cross-moved for summary judgment on both counts. On December 22, 2004, the court denied Chase's summary judgment motion and granted the debtors' cross-motion for summary judgment. Chase timely appealed and on November 16, 2005 the Honorable Jose L. Linares affirmed the bankruptcy court order as to the § 523(a)(2) count and reversed the bankruptcy court order as to the § 523(a)(4) count. The District Court determined that

2

as shareholders and officers, the debtors owed a fiduciary duty to the creditors of their closely held corporation and that a material issue of fact existed as to whether they concealed the existence of accounts receivables after the corporation became insolvent. *(November 16, 2005 Opinion of Hon. Jose L. Linares, ("District Court Opinion") pp. 19-20).*

The circumstances which underpin the nondischargeability adversary proceeding arise in connection with the operation of Dee Stewart, Inc., d/b/a Career Blazers ("DSI"). DSI was an employment agency that placed both temporary and permanent employees with businesses and other entities ("Clients"). Both debtors were officers and shareholders, although it does not appear that P. Tamis took an active role in the management of DSI. *July 20, 2004 Deposition of Philip Tamis ("P. Tamis Dep.") pp. 97-98.).*

### 1.     **DSI Debt to Chase**

On April 3, 2002, DSI executed a Business Installment Note (the "Note") in favor of Chase (P-1) The face amount of the Note, which was signed by both C. Tamis and P. Tamis was $264,000. DSI also entered into a General Security Agreement under which it granted Chase a blanket security interest in all DSI assets, including its accounts receivables. (P-2) The Chase security interest was perfected by the recordation of a UCC-1 financial statement. (P-6) Further, both P. Tamis and C. Tamis executed a guaranty of the DSI debt. *(P. Tamis Dep. pp. 61-62)* Ultimately, due to nonpayment of the Note, Chase commenced suit against DSI, P. Tamis and C. Tamis in the Superior Court of the State of New Jersey, which resulted in the entry of a default judgment in the amount of $314,972.41 against DSI, P. Tamis and C. Tamis. (P-7)

### 2.   **DSI Business Operations**

Beginning in 1995, DSI operated its business under a franchise agreement with Career Blazers Service Company, Inc. ("Career Blazers"). *(P-13, Certification of Caress Kennedy ("Kennedy Cert.") ¶ 5)* The franchise agreement expired by its own terms on January 4, 2001, but DSI and Career Blazers continued their business relationship. *(Id., ¶¶ 6 and 7)*

According to the testimony of C. Tamis, DSI placed temporary employees with Career Blazers' clients pursuant to its agreement with Career Blazers. On the other hand, DSI placed permanent employees solely for its own account. Under the franchise agreement with Career Blazers, after DSI placed temporary workers with Career Blazer clients, the payroll obligations for the temporary workers was assumed by Career Blazers. *(Id. ¶ 4).* Although Career Blazers invoiced and received payment from the clients for the payroll, it was DSI's responsibility to make sure that Career Blazers was paid. *(Id.)* C. Tamis also testified that if clients did not timely pay Career Blazers it was DSI's responsibility to demand payment. Further, Tamis testified that Career Blazers would charge back to DSI the temporary employee payroll that Career Blazers' clients failed to pay. Monthly, Career Blazers calculated on a provisional basis the fees (also referred to as a royalty) owed to DSI based on the month's activity and remitted a payment. *(Kennedy Cert. ¶ 4)* However, every month DSI and Career Blazers adjusted their accounts so that any monies due from DSI were set off against the royalties owed by Career Blazers. *(Id.)* For example, if after 90 days a Career Blazers client had not paid an invoice, Career Blazers charged DSI for the salary expense of the temporary workers. *(Id.)*

The Kennedy certification indicated that for the first five months of 2003, DSI maintained positive balances with Career Blazers (*i.e.*, royalty payments to DSI exceeded the charges due to Career Blazers); however, the Debtor began to accrue negative balances beginning in June 2003,

4

which continued through October 23, 2003 -- the date of the Kennedy certification. *(Id. ¶ 8)* The Kennedy certification further stated that the reason for the accrual of the negative balances "was a steep increase in the amount of receivables that remain more than 90-days overdue." *(Id.)* Career Blazers contended that as of the end of July 2003, DSI owed Career Blazers $54,183.[1] *(Id.)*

One of the charges deducted from the monthly royalty due to DSI was the expense for DSI's use of Career Blazers' temporary employees as part of the DSI staff. *(Kennedy Cert. Ex. B).* It is not clear from the record before the court exactly when this practice began or whether Career Blazers agreed to this practice at the time that DSI filed its Chapter 11 case. Chase contends that DSI began the practice postpetition. It claims that without notice to the court or its creditors, DSI converted its in-house staff to temporary employees on the Career Blazers payroll. Chase supports its contention by referencing a portion of the C. Tamis certification in opposition to a Career Blazers motion for relief from stay or dismissal of the DSI case. (P-12) In that certification C. Tamis stated:

> It is also not true that the debtor has transferred its payroll to Career Blazers. Only one-half of the payroll amount has been transferred to Career Blazers with their knowledge and consent, the other half has been paid by DSI, as was past practice. The receptionist, the clerks and industrial workers are paid by DSI. For Career Blazers to say that we did this without their prior consent is absolutely false. One can only look at the September 24, 2003 letter sent by me to Caress Kennedy in which she says "I told Joseph that we would no longer be able to pay your staff on the temporary payroll". If this was not in agreement then why did she acknowledge that this is what we have been doing in the past?

*(P-12, ¶ 5)* Chase claims that the foregoing statements by C. Tamis are admissions that DSI's postpetition use of Career Blazers' employees was not in the ordinary course of DSI's business.

---

[1] The Kennedy certification at ¶ 8 appears to be at odds with the spreadsheet annexed to the certification as Exhibit B. The exhibit shows a balance of $54,183 due to Career Blazers as of the end of September 2003.

5

However, the trial testimony and the trial exhibits do not support Chase's position.

At trial, C. Tamis testified that it was always DSI's practice to staff its operations by using Career Blazer employees. Further, it appears that the Franchise Agreement between DSI and Career Blazers permitted the use of Career Blazers' employees at the DSI premises if Career Blazers consented. *Kennedy Cert. Ex. A, Sec. 9K)* Moreover, the "Paramus Royalty Deficit Analysis" annexed as Exhibit B to the Kennedy Certification contains a line item identified as "In-house Temp" that shows prepetition charges for such services. Particularly in light of these contextual facts, it is evident that Chase misconstrues the statements of C. Tamis quoted above . On their face, the C. Tamis statements merely disagree with the contention in the Kennedy Certification (*Kennedy Cert. ¶ 10)* that the entire payroll obligation was transferred to Career Blazers without obtaining Career Blazers' consent.

DSI's operation did not improve after its Chapter 11 case was filed. As reflected in Exhibit B to the Kennedy Certification, DSI's negative account balances with Career Blazers continued to grow. Consequently, in October 2003 Career Blazers filed a motion to dismiss the case or alternatively, to (i) grant stay relief, (ii) terminate the commercial relationship, (iii) allow its administrative expense claim and (iv) permit it to exercise setoff rights. While that motion was pending, Career Blazers also filed a motion to compel the turnover of funds it claimed DSI had converted. At the hearing on these motions, the court appointed a Chapter 11 Trustee (P-10) and continued the Career Blazers motions to a later date. On the adjourned hearing date, Career Blazers sought to retain $5,175 which a DSI customer mistakenly paid to it and to obtain from the Trustee the payments she received from Career Blazers' clients. In opposition to the motion, Chase claimed that all of the funds were subject to its security interest. The Chapter 11 Trustee sought dismissal of the case on the grounds that no reorganization was likely and no assets existed that warranted

6

administration by a trustee.

The court granted dismissal, but also required that all funds be deposited in the court registry subject to a determination of the respective rights to the funds. (P-10) Subsequently, by order dated March 16, 2004, the court denied Chase's motion for turnover, denied the Trustee's request for fees and expenses under § 506(c) of the Bankruptcy Code and granted Career Blazers' motion for turnover. (P-9)

### 3. The $30,791.13 Account Receivable

Chase asserts that when DSI filed its Chapter 11 case, Career Blazers owed DSI royalties in the amount of $30,791.13. Chase further claims that these unpaid royalties constituted DSI accounts receivable to which the Chase security interest attached. However, the factual record to support Chase's contention that accounts receivable existed on the DSI petition date is not clear, much less compelling.

Chase relies on the C. Tamis Certification for its contention that Career Blazers owed DSI $30,791.13. *(Tamis Cert. ¶¶ 8-9).* In that certification, C. Tamis does indeed claim that prepetition royalties in the sum of $30,791.13 were owed. *(Id.)* She supports that claim by reference to Exhibit M attached to her certification. Exhibit M is captioned "Paramus-Over 90 Days September 30, 2003." *(Id.)* It does indeed show a $30,791.13 line item for "Net Total on Over 90 Days," but it also contains a $28,636.75 line item for "Net Total at 93%."[2] *(Id.)* Both of these figures are computed as of September 30, 2003, not the petition date of July 23, 2003. Additionally, from other documents placed in evidence, it appears that other sums owed to Career Blazers either substantially

---

[2] Exhibit M does not describe the line item "Net Total at 93%" and no testimony was elicited on the subject.

7

reduced or perhaps eliminated any royalty payment that was due on the petition date. For example, Exhibit B to the Kennedy certification indicates that as of the end of July 2003, a royalty deficit of $5,383 existed and that the deficit grew to $21,376 and then to $27,423 by the end of August 2003 and September 2003, respectively. *(Kennedy Cert. Ex. B).* No testimony was adduced at trial regarding the preparation of either document and the court is at a loss as to how to reconcile the competing certifications and exhibits on which Chase relies.

At trial, C. Tamis repeated her contention that Career Blazers owed DSI approximately $30,000.00. However, she also testified that the Career Blazers report on which she relied was for the period ending September 30, 2003. Thus, it is not clear what amount she believed Career Blazers owed to DSI as of the petition date – July 23, 2003. C. Tamis further testified that she did not prepare the bankruptcy schedules. Rather, a DSI employee assisted bankruptcy counsel in preparing the DSI bankruptcy schedules. C. Tamis stated that she understood that accounts receivable were not listed as an asset on the bankruptcy schedules because DSI owed money to Career Blazers as of the DSI petition date.

### 4. **DSI Insolvency**

A key element for establishing the existence of DSI's fiduciary duty to its creditors is proof of DSI's insolvency. It is readily apparent that at least as of the DSI petition date, July 23, 2003 DSI's liabilities exceeded its assets. In its bankruptcy schedules, DSI listed total assets amounting to $23,000.00 and total liabilities amounting to $481,701.00. (P-8) It is also likely that DSI was insolvent as early as December 2002. *(P. Tamis Dep. pp. 98-99)*

**DISCUSSION**

Chase seeks a judgment determining that its "entire debt" is nondischargeable under § 523(a)(4) of the Bankruptcy Code "because Defendants committed defalcation while acting in a fiduciary capacity."[3] *(Plaintiff's Post Trial Brief p. 10)*

Section 524(a)(4) provides, inter alia, that an individual debtor may not be discharged from a debt that arises from a fraud or defalcation while acting in a fiduciary capacity. To succeed under this part of the statute, a plaintiff must prove (i) a fiduciary relationship and (ii) that a fraud or defalcation occurred while the defendant acted in a fiduciary capacity. In the present matter, the District Court has ruled that DSI was insolvent, and that as officers and directors of an insolvent corporation, P. Tamis and C. Tamis owed a fiduciary duty to the creditors of DSI. *(District Court Opinion pp. 19-20).* Further, the District Court agreed with *Mercedes-Benz Credit Corp. v. Carretta (In re Caretta)*, 219 B.R. 66 (Bankr. D.N.J. 1998) that this fiduciary relationship is sufficient to establish the fiduciary capacity required for the purposes of § 523(a)(4). Thus, the sole focus at trial was to determine whether any defalcations occurred as a result of the conduct of C. Tamis and P. Tamis as officers and directors of DSI.

Like the phrase "fiduciary capacity," the meaning of the term "defalcation" is a matter of federal law. *Carlisle Cashway, Inc. v. Johnson (In re Johnson),* 691 F.2d 249, 254 (6th Cir. 1982)("Federal, not state law controls our determination because it is the intent of Congress in using the word 'defalcation' that we seek to discover.") Unfortunately, ascertaining the meaning of

---

[3] Presumably, what Chase requests is that its $314,972.41 default judgment be declared nondischargeable. Curiously, it has never explicitly requested this relief. The Complaint actually requested that the Court declare that the debtors are not entitled to a discharge, dismiss the bankruptcy case and grant Chase attorney fees and costs.

9

defalcation in § 523(a)(4) is hampered by the fact that the term is not defined in the Bankruptcy Code and there is no legislative history that illuminates its intended meaning. As a result of this lack of statutory guidance, the courts, including the Circuit Courts of Appeal, are split on the mental state required to establish defalcation or whether wrongful conduct is a necessary element.

The Third Circuit Court of Appeals has not yet spoken on how to define defalcation. A number of other circuits have considered the issue and the decisions can be roughly grouped into three approaches. The Fourth, Eighth and Ninth Circuits hold that an innocent default or negligence which results in misappropriation or default is sufficient. *Rwanda v. Uwimana (In re Uwimana)*, 274 F.3d 806, 811 (4th Cir. 2001) citing *Pahlavi v. Ansari (In re Ansari)*, 113 F.3d 17, 20 (4th Cir. 1997); *Tudor Oaks Limited Partnership v. Cochrane, (In re Cochrane)*, 124 F.3d 978, 984 (8th Cir. 1997); *Lewis v. Scott (In re Lewis),* 97 F.3d 1182, 1186 (9th Cir. 1996). The court in *Lewis* stated that:

> Defalcation is defined as the "misappropriation of trust funds or money held in any fiduciary capacity; [the] failure to properly account for such funds." Under section 523(a)(4), defalcation "includes the innocent default of a fiduciary who fails to account fully for money received." ... An individual may be liable for defalcation without having the intent to defraud.

*Lewis,* 97 F.3d at 1186-87. Unsurprisingly, Chase asserts that we should follow this line of authority.

The Fifth and Seventh Circuits hold that at least reckless conduct is required for a finding of defalcation. The Fifth Circuit finds that a "willful neglect" of a fiduciary duty constitutes a defalcation and characterizes this conduct as "essentially a recklessness standard." *Schwager v. Fallas (Matter of Schwager),* 121 F.3d 177, 185 (5th Cir. 1997). Recognizing a split among the circuits as to whether defalcation may result from negligence and that objections to discharge are

strictly construed against the creditor and in favor of the debtor, the Seventh Circuit concludes that "we cannot say that Congress intended for a debt arising from a mere negligent breach of fiduciary duty to be excepted from discharge under section 523(a)(11)." *Meyer v. Rigdon,* 36 F.3d 1375, 1385 (7th Cir. 1994).

The Sixth Circuit Court of Appeals seems to occupy a midpoint between the Fourth, Eighth and Ninth Circuits on the one hand, and the Fifth and Seventh Circuits on the other. In *Johnson*, the Sixth Circuit interpreted § 17(a)(4) of the 1898 Bankruptcy Act, the predecessor statute to § 523(a)(4). The court found that no intent or actual knowledge was needed for defalcation, but that the conduct must be more than "mere negligence." 691 F.2d at 254-57. The Sixth Circuit announced that defalcation must be measured by an objective standard, stating that "[t]he character of the liability imposed upon a fiduciary for appropriating property held by him in trust is the same whether he has actual knowledge that the law imposes a duty or is merely charged with such knowledge." *Id.* at 257. Thus, in *In re Bucci,* 493 F.3d 635, 639 (6th Cir. 2007) it stated that a defalcation encompasses not only embezzlement and misappropriation by a fiduciary, but also the failure to account for funds.

The First Circuit imposes a higher threshold, requiring a showing of extreme recklessness, "akin to the level of recklessness required for scienter." *In re Baylis*, 313 F.3d 9, 20 (1st Cir. 2002). The Second Circuit recently announced its agreement with *Baylis*, stating that "defalcation under § 523(a)(4) requires a showing of conscious misbehavior or extreme recklessness - a showing akin to the showing required for scienter in the securities law context." *In re Hyman*, 502 F.3d 61, 68 (2d Cir. 2007). Both courts relied in part on statutory analysis, finding that requiring conscious misbehavior is consistent with the other intentional misconduct (fraud, embezzlement, larceny) identified in § 523(a)(4). *Baylis*, 313 F. 3d at 20; *Hyman*, 502 F.3d at 68.

11

This court is persuaded that *Baylis* and *Hyman* state a standard for defalcation that is most in harmony with the Bankruptcy Code generally, and § 523(a)(4) in particular. *Baylis* takes note of the structure of § 523, pointing out that the exceptions to discharge basically fall into two categories. 313 F.3d at 19. One category encompasses debts for which an individual, as a matter of public policy, should remain liable. *Id*. These obligations include such debts as those for certain taxes or custom duties (§ 523(a)(1)), alimony and child support (§ 523(a)(5)), and orders of restitution (§ 523(a)(13)). *Id.* "The level of fault of the debtor has no bearing on these exceptions; the exception turns on the type of debt." *Id. Baylis* infers that the second category of exceptions is premised on fault and "[t]hese exceptions define not the type of debt itself, but the type of fault that caused the debt." *Id*. These exceptions include debts arising from money, goods or services obtained by fraud, false pretenses or false representations (§ 523(a)(2)), willful and malicious injury (§ 523(a)(6)); death or injury caused by driving under the influence of alcohol or drugs (§ 523(a)(9)) and fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny (§ 523(a)(4)). *Id.* From this review of the structure of § 523, the court in *Baylis* concluded that an act of defalcation by a fiduciary must be a serious one, and some fault must be involved. *Id.*

The court confirmed its interpretation by looking at the specific language of § 523(a)(4). Based on its analysis, it concluded that conduct constituting defalcation must be of a similar gravity as conduct that gives rises to a discharge exception for fraud, embezzlement or larceny. *Id.* But, recognizing that defalcation must mean something different from the other terms, it found that proof of specific intent is not required. Rather, "a creditor must be able to show that a debtor's actions were so egregious that they came close to the level that would be required to prove fraud, embezzlement or larceny. ... The mental state required for defalcation is akin to the level of recklessness required for scienter. It is more than the mere conscious taking of risk associated with

the usual torts standard of recklessness. ... Instead, defalcation requires something close to a showing of extreme recklessness." Id. at 20. *(citation omitted).*

The court in *Hyman* was also persuaded that a showing of extreme recklessness is a proper measure of defalcation because it "ensures that the term 'defalcation' complements but does not dilute the other terms of the provision - 'fraud', 'embezzlement', and 'larceny' - all of which require a showing of actual wrongful intent."  502 F.3d at 68. *Hyman* stated that such a standard for defalcation means that "the harsh sanction of dischargeability is reserved for those who exhibit 'some portion of misconduct.'" *Id.* at 68-69 *(quoting Cen. Hanover Bank & Trust Co. v. Herbst,* 93 F.2d 510, 512 (2d Cir. 1937)).  Moreover, it observed that use of this standard would not "reach fiduciaries who may have failed to account for funds or property for which they were responsible only as a consequence of negligence, inadvertence or similar conduct not shown to be sufficiently culpable. " *Id.* at 69.  Finally, the Second Circuit also concluded that using the standard of extreme recklessness to define defalcation "has the virtue of ease of application since the courts and litigants have reference to a robust body of securities law examining what these terms mean." *Id.*

This court agrees with both *Baylis* and *Hyman* that an extreme recklessness standard for measuring defalcation is the standard most consistent with the long held view that exceptions to discharge should be narrowly construed in favor of the Bankruptcy Code's "fresh start" policy. *Baylis*, 313 F.3d at 17 (quoting *Century 21 Balfour Real Estate v. Menna (In re Menna)*, 16 F.3d 7, 9 (1st Cir. 1994).  The Third Circuit has likewise stated that a strict construction furthers the purpose of the Bankruptcy Code "to relieve debtors from the weight of oppressive indebtedness and provide them with a fresh start." *Ins. Co. of Am. v. Cohn (In re Cohn)*, 54 F.3d 1108, 1113 (3d Cir. 1995).

If a lesser or more broadly defined standard for defalcation is employed, it runs the risk of encompassing ordinary mistakes of judgment.  For example, the standard followed by the Fourth,

13

Eighth and Ninth Circuits captures poor record-keeping, a common failure of many individuals and businesses that file for bankruptcy relief. Thus, this court further agrees with the court in *Zohlman v. Zoldan (In re Zoldan),* 226 B.R. 767, 777 (S.D.N.Y. 1998) that a broad reading of defalcation should be avoided because of the ever-expanding definition of the term "fiduciary." *Zoldan* explains that:

> When state courts and legislatures create express or technical trusts in a plethora of areas, from corporate officers, to joint ventures, attorneys, building contractors, real estate agents, insurance brokers, and executors, often without considering the substantial ramifications such expansion could have in the bankruptcy context, each of these individuals becomes a "fiduciary" for purposes of the Bankruptcy Code. Given the ever expanding definition of what constitutes a "fiduciary," to couple this expansion with an equally expansive view of defalcation would defeat the fresh start objective of the bankruptcy law. (citation omitted)

*Id.*

The Third Circuit has long held that scienter is a "mental state embracing intent to deceive, manipulate or defraud." *U.S. S.E.C. v. Infinity Group Co., et al,* 212 F.3d 180, 192 (3d Cir. 2000) quoting *McLean v. Alexander*, 599 F.2d 1190, 1196-97 (3d Cir. 1979); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 195 n. 12 (1976). See also, *Coleco Industries, Inc. v. Berman,* 567 F.2d 569, 574 (3d Cir. 1977). Further, it agrees with the Seventh Circuit that the scienter required for securities fraud includes recklessness and finds recklessness to include:

> [H]ighly unreasonable (conduct), involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*McLean*, 599 F.2d at 1197 (citing *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1045 (7th Cir. 1977).

However, the Third Circuit has also cautioned that "good faith, without more, does not

necessarily preclude a finding of recklessness." *Infinity Group Co.,* 212 F. 3d. at 192. In *Infinity,* the SEC filed a civil securities fraud action against an investment trust and its principals. The individual defendants raised the defense that the SEC failed to establish scienter. The individuals claimed that they acted in good faith in that they believed the representations in Infinity Group's promotional literature to be true. 212 F.3d at 192. Among the representations made was the statement that investors were guaranteed to receive an annual rate of return ranging from 138% to 181% depending on the amount of the principal investment. *Id.* at 184-85. The Third Circuit's survey of the factual record before the district court led it to conclude that the district court had properly rejected the good faith argument advanced by the defendants. *Id.* at 193.[4] It specifically pointed out that even if it assumed that the individuals actually believed the promotional representations, "[a] good faith belief is not a 'get out of jail free card.' " *Id.* A good faith belief "will not insulate the defendants from liability it is the result of reckless conduct." *Id.*

Accordingly, if Chase demonstrates an extreme departure from the standards of ordinary care, the defendants' claim of good faith does not save them. However, as set forth below, it is apparent that Chase has completely failed to prove its case. As the party objecting to dischargeability of the debt owed to it, Chase must establish its entitlement to such relief by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 287-88 (1991). When preponderance of evidence is the standard of proof, "the plaintiff's burden is to convince [the fact finder] upon all the evidence before [it] that the facts asserted by the plaintiff are more probably true than false." *Applebaum v. Henderson (In re Henderson),* 134 B.R. 147, 156 (Bankr. E.D. Pa. 1991)(quoting *Burch v. Reading Co.*, 240 F. 2d 574, 579 (3d Cir. 1957).

---

[4] It noted that the district court had evidence before it that (i) less than half of the money received was ever invested, (ii) over $3.6 million was spent on personal items, including a home and a Mercedes Benz, and (iii) the defendants conceded that no profits were ever realized from the moneys that investors provided. 212 F.3d at 192.

Most significantly, the record before the court does not contain any evidence that a royalty of $30,791.13 was actually payable to DSI in the prepetition period. Rather, the record indicates that prepetition, Career Blazers was owed money by DSI, so that any royalty earned by DSI was not payable to it. The Kennedy Certification and supporting exhibits (proffered by Chase) demonstrate this to be so. Further, C. Tamis testified, without contradiction, that she understood that accounts receivable from Career Blazers were not listed as assets on DSI's bankruptcy schedules because DSI's obligation to Career Blazers exceeded any funds due to it as of the petition date. It is certainly true that it would have been better practice to schedule both the royalty due and any payment owed to Career Blazers. By so doing, the financial condition of DSI could have been more accurately reported. However, the failure to properly schedule the accounts receivable appears to be a mere mistake, which the court suspects is in part attributable to a lack of guidance from debtor's counsel. Moreover, the nondisclosure certainly does not meet the extreme recklessness standard. Chase has also not demonstrated any injury from the nondisclosure. There is no harm to Chase arising from the failure to list accounts receivable as there were no receivables that were not subject to offset by Career Blazers. Thus, there were no accounts receivable to which Chase's security attached and Chase suffered no damages from this purported defalcation.

Chase also argues that C. Tamis and P. Tamis breached their fiduciary duty and committed a defalcation by using Career Blazers' employees to staff DSI. Chase contends that this conduct amounted to an unauthorized postpetition financing of DSI payroll that caused injury to Chase. Chase notes that in the course of DSI's postpetition operations an account payable to Career Blazers was created in the amount of $54,183.00. From the exhibits and testimony it appears that this obligation arose in part from DSI's failure to pay for its use of Career Blazers' temporary employees. Chase characterizes DSI's nonpayment as an "unauthorized and undisclosed funding of payroll. Chase posits that this account payable in favor of Career Blazers produced a setoff to

16

the $30,791.13 royalty that Career Blazers owed to DSI. Chase thereupon concludes that P. Tamis and C. Tamis secretly dissipated Chase's collateral during the DSI bankruptcy, without either seeking the court's permission to obtain financing, or to use estate assets out of the ordinary course of business, thereby committing a defalcation.

None of the facts adduced at trial support this construct. First, no evidence was placed in the record that demonstrated that P. Tamis participated in the operation of DSI. Thus, Chase did not establish any conduct by P. Tamis that could amount to a defalcation. Second, as recounted above, Chase did not prove that there were any accounts receivable to which its security interest attached. As a result, there is no evidence that P. Tamis or C. Tamis caused DSI to improperly use Chase's cash collateral in the postpetition period. Third, at most, the testimony and exhibits placed in evidence establish that DSI's use of Career Blazers temporary employees had been a longstanding practice and that DSI continues this practice after filing for bankruptcy. It is also abundantly clear that Career Blazers did not know that DSI had filed a Chapter 11 petition and thus did not know that DSI used Career Blazers' temporary employees while operating as a debtor-in-possession. Accordingly, if DSI's continued use of Career Blazers' temporary employees can be characterized as unauthorized postpetition financing, it is apparent that Career Blazers did not offer or consent to extend postpetition financing. Rather, on learning of the bankruptcy, Career Blazers moved immediately to terminate its business relationship with DSI.

Finally, from the evidence before it, the court concludes that the so-called "unauthorized financing" claimed by Chase resulted from three events: a) chargebacks by Career Blazers to DSI as a result of nonpayment by Career Blazers clients, b) DSI's failure to pay Career Blazers for its use of Career Blazers' temporary employees and c) DSI's inability to generate sufficient royalty income to offset both charges. In short, the "unauthorized financing" was produced by DSI operating with a negative cash flow. Without more, these facts cannot sustain a claim of defalcation.

17

Chase has failed to prove any damages and any conduct by either defendant that rises to the level of extreme recklessness.

## **CONCLUSION**

Chase has neither proved that the defendants acted with extreme recklessness nor that it suffered any damages from the manner in which the defendants operated DSI.

Dated:       December 17, 2008

_____
NOVALYN L. WINFIELD
United States Bankruptcy Judge